## Cowdery v. Shafer et al.

*Caldwell, Fox & Stoner,* for plaintiff.

*Harrington Adams,* Deputy Attorney General, and *James H. Duff,* Attorney General, for State Board of Medical Education and Licensure.

RUPP, J., April 30, 1946.—Plaintiff seeks permanently to enjoin the State Board of Medical Education and Licensure from revoking or suspending his license to practice drugless therapy (neuropathy and nauropathy) in this Commonwealth.

The bill of complaint avers, inter alia, that plaintiff was duly licensed on August 27, 1940; that on March

2, 1945, he was cited by the board to show cause why his license should not be revoked on the ground of "unethical practice or a form of pretense which might induce citizens to become a prey to professional exploitation", the basis of the complaint being the allegation that he had practiced medicine by the use of drugs; that pursuant to the citation a hearing was held before the board on March 16, 1945; that subsequently, on May 17, 1945, the board issued an order revoking the license, effective June 16, 1945; that plaintiff is not guilty of the charges and that he never at any time practiced medicine by the use of drugs; that the board's findings of fact and conclusions of law are not supported by competent legal evidence and therefore its action was illegal, unjustified and unwarranted; that plaintiff has a valid property right in the license; that the proceedings before the board were pursuant to the Medical Practice Act of June 3, 1911, P. L. 639, as amended by the Act of August 6, 1941, P. L. 903, 63 PS §§401-415, which does not provide for an appeal from the board's decision; and that plaintiff will suffer immediate and irreparable injury unless the board is restrained from suspending or revoking the license.

Defendants filed a responsive answer denying, inter alia, that plaintiff is not guilty of the charges, that their findings and conclusions are not supported by competent evidence, and that its action was illegal, unjustified and unwarranted.

The matter was argued on the bill and answer without the taking of testimony. Subsequently, the parties stipulated that in lieu of taking testimony on the bill and answer before the court, the following be made the record in this case—the testimony taken before the board on March 16, 1945; the findings of fact, conclusions of law, and order of the board; and a copy of the board's regulations governing the practice of drugless therapy at the time of the alleged offense.

It is settled that where, as here, no appeal is provided by statute and property rights are involved, some method of review of the action of administrative officers or boards by a judicial tribunal must be afforded; otherwise there is no due process of law; and where there is an alleged illegal action which should be prevented, the forum is equity: Nevins Drug Co. v. State Board of Pharmacy, 49 Dauphin 145 (1940); Harris v. State Board of Optometrical Examiners, 287 Pa. 531 (1926).

As we view it, our only function in this matter is to determine whether there is sufficient evidence before the board to support its findings of fact, conclusions of law, and the order made pursuant thereto.

The Act of June 3, 1911, P. L. 639, supra, under which plaintiff was licensed, does not define "Drugless Therapy", but the rules and regulations of the board relating thereto, promulgated under the act and effective at the time of the alleged offense, provided:

"The State Board of Medical Education and Licensure has adopted the term 'Drugless Therapy' to designate the type of licensure granted to persons who qualify under its requirements for such limited form of medical practice. Drugless Therapy includes any system of practice of the healing art *which does not employ the use of drugs* or the use of surgery, osteopathy and optometry alone excepted.

"Drugless Therapy embraces:

"1. Any treatment which has the spine for a basis and includes . . . Neuropathy, Naturopathy. . . .

"The license issued for this limited practice of the healing art will contain the term 'Drugless Therapy' and also the name of the special designation of the particular type of drugless therapy under which the applicant qualifies. It limits the holder to the practice of this specific form of therapy.

"*Licensure in Drugless Therapy does not permit the holder to practice* Pharmacy, Dentistry, Osteopathy,

nor to treat persons afflicted with any quarantinable disease. It does not permit the holder to practice surgery, midwifery nor *medicine by the use of drugs*. It does not authorize the right to use the term 'doctor' ('Dr.') without designating wherein the degree was received and then only when a graduate from a legally chartered institution." (Italics supplied.)

The board found as a fact that:

"During the months of April and May and during the Fall of 1944 and the month of January, 1945, the respondent, Mr. Walter Hall Cowdery, treated Mrs. Helen M. Kohn, 825 West Main Street, Norristown, Pa., professionally by furnishing her with medicine for internal use in the form of packages of powders, capsules, pelletts and ampules of liver and iron extract."

And concluded as a matter of law that:

"The rules and regulations of the State Board of Medical Education and Licensure under the provisions of the Act of June 3, 1911, P. L. 639-649, as amended, among other things provide that 'Licensure in Drugless Therapy does not permit the holder to practice Pharmacy, Dentistry, Osteopathy, nor to treat persons afflicted with any quarantinable disease. It does not permit the holder to practice surgery, mid-wifery nor medicine by the use of drugs.'

"Administering drugs in the treatment of a patient by an individual licensed to practice Drugless Therapy (Neuropathy and Naturopathy) . . . constitutes a flagrant and wilful violation of the Medical Practice Act."

Thus, the sole question before us is, does the evidence support a finding that plaintiff treated Mrs. Kohn professionally by furnishing her with powders, etc., for internal use, and, if so, did the board properly conclude he was guilty of the aforesaid violation by practicing medicine by the use of drugs?

Plaintiff testified that Mrs. Kohn was under his care during portions of 1943, 1944 and the early part of

January, 1945; that she called at his office, accompanied by her daughters, and he visited her at her home; that during one of Mrs. Kohn's visits to his office in April 1944 she showed him "a rash she had in the folds of her skin, on her face and about her ears"; that as a part of his treatment on that occasion he gave her some capsules known as "Lax Food Special"; and that "we usually use it in cases where there is skin irritation or lack of elimination". On an office visit in May 1944 he gave her another box of Lax Food Special and Food No. 31" or "Anabolic No. 31". He likewise admitted giving her two envelopes offered in evidence, one containing powder in white and pink papers and three yellow capsules, inscribed "Mrs. Kohn. Take the white powder on arrival. Yellow capsules are for insomnia, and are to be used only when required. December 7th, 1944"; and the other containing pink capsules and pink powder papers entitled "Mrs. H. Kohn. Take the white powder immediately, then a pink powder every evening. Two pellets in HOT water every two hours. November 29th, 1944; Dr. Cowdery." In addition, plaintiff testified that on one of his professional visits to Mrs. Kohn's home, during her confinement to bed, he left some ampules of liver and iron which she had requested him to bring, and which he understood a nurse was to use for injections.

It is evident that, even without more, plaintiff's own testimony supports the board's finding.

The board also had before it other exhibits which, with the foregoing, were obtained from Mrs. Kohn's bedside table and were brought to the hearing by Helen Louise Smith, a daughter who resided with her mother. These included two envelopes inscribed "Mrs. Kohn" containing powder in white and pink papers and bearing directions for taking, one dated January 4, 1945, and signed "Dr. Cowdery", the other allegedly sent through the mail and dated January 25, 1945. Although plaintiff could not recall sending the latter

envelope, he admitted the contents resembled powders he had given Mrs. Kohn on other occasions. A bottle also was submitted containing tablets designated as "special high potency organic iron tablets, together with liver extract and additional components of the Vitamin B Complex", which plaintiff denied giving Mrs. Kohn, but which Miss Smith testified he gave her on one of his home visits "to build her up and give her an appetite".

Miss Smith also testified that on the numerous occasions she accompanied her mother to plaintiff's office he always handed her mother medicine with directions to take "one powder at night and one on arising"; that the powders were supposed to be for a "streptococcic infection" for which he was treating her mother; that she heard plaintiff tell her mother she was suffering from a streptococcic infection complicated by a "second change"; that upon being asked regarding the giving of sulpha for the streptococcic infection he explained it was included in the powders given Mrs. Kohn; that Mrs. Kohn was given injections by plaintiff in his office and during one home visit the witness personally saw him inject liver and iron in her mother's arm; that she also was present during his home calls when he left medicine for her mother, certain of which the witness heard him tell her mother was to clean out the lining of an internal organ; that on one of these occasions he left Lax Food Special "for constipation"; and that twice he left ampules of liver and iron for someone else to use for injections for her mother.

Plaintiff denied personally giving Mrs. Kohn injections and diagnosing her condition as a "second change", although he admitted questioning her concerning streptococcic symptoms and looking in her throat and saying certain highly inflamed areas resembled a streptococcic condition.

Another daughter, Mrs. Catherine S. Hepburn, testified that she also accompanied her mother to plaintiff's

office and was present during his home calls. She reiterated her sister's testimony as to hearing the plaintiff's above diagnosis of her mother's condition, quoting him as saying "the streptococcic infection would take a year to get out of her system"; as to seeing the giving of the above powders to correct that condition, as well as some of the other medicines; and as to seeing the giving of injections. Incidentally, this witness also testified that plaintiff examined her sister, diagnosed her trouble as anemia, and gave her some pellets to rectify that condition.

Despite all the foregoing, plaintiff maintains that the board's action was unwarranted, in that the substances he furnished Mrs. Kohn are not drugs but foods, which he was authorized to prescribe, since naturopathy employs dietetics. To this end he testified that the Lax Food Special is produced by Anabolic Food Products, Inc., that anybody can buy it, and read as follows from the box holding the capsules: "active ingredients: rhubarb root. Complete ingredients: powdered rhubarb root, irish moss, cranberries, rhubarb stalk, parsley and asparagus, enclosed in gelatin capsules". Similarly, he read the following ingredients from a box entitled "Anabolic No. 31, a dietary supplement": "Powdered parsley, watercress, celery, okra, asparagus and kelp, enclosed in gelatin capsules". He added that the white powder papers contained "pulverized sugar" the pink papers cane sugar—saccharoid" and the pink capsules "sugar of milk".

These so-called "foods" were not chemically analyzed. Accepting plaintiff's analyses, was the board justified in concluding the substances he supplied were drugs?

The Act of 1911, supra, and the rules and regulations of the board regarding drugless therapy, do not define the term "drug", nor have we found or been directed to any Pennsylvania or other decision contain-

ing such a definition. Hence, we must resort to the commonly accepted meaning of the word.

Webster's New International Dictionary (2nd ed.), Unabridged, defines a "drug" as "Any substance used as a medicine, or in making medicines, for internal or external use"; and "medicine" as "any substance or preparation used in treating disease."

Almost identically, Gould's Medical Dictionary (Scott), (4th rev. ed.), defines a "drug" as "a substance used as a medicine"; and states that "medicine" is "any substance given for the cure of disease."

Thus, it will be seen that whether in common or medical parlance, *any* substance used as a medicine is a drug, and a medicine is *any* substance or preparation given or used for the purpose of treating or curing disease.

Therefore, in effect, our question really becomes, did plaintiff exceed the limitations of his license by using medicines?

Our courts have defined "medicine" as "a remedial agent that has the property of curing or mitigating diseases, *or is used for that purpose*" (italics supplied). See Commonwealth v. Seibert, 262 Pa. 345, 348 (1918) and Commonwealth v. Long, 100 Pa. Superior Ct. 150 (1930).

Likewise, in State v. Bresee, 137 Iowa 673, 114 N. W. 45 (1907), the Supreme Court of Iowa had before it on appeal, among others, the question whether defendant was guilty of prescribing and furnishing medicine for the sick without first having obtained a license to practice such profession. Referring to certain tablets administered by her known as "Schuessler's Tissue Food" the court said (p. 678):

"The fact that the appellant was careful to call the article which she supplied to the sick 'food,' instead of 'medicine,' is not at all decisive of the merits of the case. It is evident she was catering to the patronage of the sick who were asking relief from their ills, and,

if she listened to their statements, assured them of her ability to help them, and supplied them with her alleged appropriate remedies giving instructions for their application or use, this would seem to come within the definition given by the court, as well as within the ordinary and usual signification attached to the words 'prescribing' or 'prescribing and furnishing medicines,' as they are commonly used and understood. Medicine as defined by Webster is 'any substance administered in the treatment of disease; a remedial agent; a remedy.' The fact that the substance so employed as a remedial agent may have value as a food, and have a tendency to build up and restore wasted or diseased tissue, will not deprive it of its character as a medicine *if it be administered and employed for that purpose.*" (Italics supplied.)

Commonwealth v. Seibert, supra, and State v. Bresee, supra, were cited with approval by the Supreme Court of North Dakota in State v. Miller, 59 N. D. 286, 229 N. W. 569 (1930), where, at page 295, it said:

"Whether a remedy prescribed and furnished is harmless, or has any effect, whatever is not involved. *Even a food may be a medicine 'if it is administered and employed for that purpose.'* State v. Bresee, 137 Iowa, 673, 24 L. R. A. (N. S.) 103, 114 N. W. 47. While the term 'medicine,' in a law regulating the sale of medicine, ordinarily would not include distilled water, milk, or bicarbonate of soda yet when the term is used with reference to prescriptions given by one diagnosing diseases and prescribing remedies these may become medicines in the sense used. As said in Com. v. Seibert, 262 Pa. 345, 105 Atl. 507, 'The word "medicine" is susceptible of distinct meanings; one indicating nothing more than a remedial agent that has the property of curing or mitigating diseases, *or is used for that purpose,* while the other indicates an act of healing.' *If prescribed as a medicine, as that*

*term is usually understood in this relation, then we are not concerned with the ingredients. To prescribe and furnish water and peppermint 'to settle the stomach', or water and soda 'to relieve gas' is prescribing and furnishing as a medicine."* (Italics supplied.)

From all the foregoing, it is clear that, under the instant circumstances, in determining whether a substance is used as a medicine and therefore is a drug, it is not the substance which is used which is controlling, but rather the manner, method and circumstances under which, and the purpose for which it is used.

Here, a careful study of the testimony convinces us that the board properly could conclude that plaintiff, in his professional capacity, gave the substances involved for the purpose of treating, curing or mitigating disease, and that in so doing he exceeded the scope of his limited licensure by practicing medicine by the use of drugs. This conviction eliminates any necessity for discussing the limited field within which dietetics, as such, may be employed by naturopaths.

There being no error in the board's finding or conclusion, its order must stand and the bill must be dismissed.

We have not overlooked the cases cited by plaintiff, but have found nothing in them to help him. Of the two on which he lays particular stress, Board of Pharmacy of the State of New Jersey v. Quackenbush & Company, "Passaic County Ct. of Common Pleas, N. J., 10/23/40, Davidson, C. P. J." has no bearing whatsoever, since the question there involved was whether "Vitamin Plus" was a food for the purpose of determining whether it should be sold under the supervision of a registered pharmacist. And in King v. Board of Medical Examiners et al., 65 Cal. App. (2d) 644, 151 P. (2d) 282 (1944), the California District Court of Appeal, First District, Division 2, found the charge of administering drugs by a drugless practitioner was not proved because the undisputed evidence showed

that "Min-a-rex" and "Vitamin Capsules" were not used for the purposes denounced by the pertinent code, i. e., in the treatment of a disease, etc.

And now, April 30, 1946, the bill of complaint is hereby dismissed.